IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PATRICIA HALL,                    )
                    Plaintiff,    )
                                  )
        vs.                       )        Civil Action No. 11-115
                                  )
GUARDSMARK, LLC,                  )
                    Defendant.    )

<u>MEMORANDUM OPINION</u>

Plaintiff, Patricia Hall, brings this action against Defendant, Guardsmark, LLC, alleging

claims of sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e to 2000e-17 (Title VII), and the Pennsylvania Human Relations Act, 43 P.S.

§§ 951-63 (PHRA), arising out of Guardsmark's alleged toleration of a hostile work environment

and acts of retaliation, ultimately culminating in her constructive discharge from employment as

a security officer on July 16, 2009.

Currently pending before the Court for disposition is a motion for summary judgment,

filed by Defendant.  For the reasons that follow, the motion will be granted with respect to the

retaliation claims and denied in all other respects.

<u>Facts</u>

Plaintiff began working as a security officer with Guardsmark on August 6, 2008, at the

BASF facility, a chemical plant, in Evans City, Pennsylvania. (Hall Dep. at 23:13, 16; 25:1-7.)[1]

Two security officers were assigned to the BASF facility in each of three (3) shifts – 8:00 a.m. to

4:00 p.m., 4:00 p.m. to midnight, and midnight to 8:00 a.m.  The security officers were stationed

in the BASF facility Gatehouse. (Hall Dep. at 37:6-11; 38:5-7.)  Plaintiff trained at the BASF

---

[1] Def.'s App. (ECF No. 29) Ex. 1.

facility for two (2) weeks, during which time she was assigned to the 8:00 a.m. to 4:00 p.m. shift. (Hall Dep. at 38:13-19.)

Plaintiff worked the 8:00 a.m. to 4:00 p.m. shift with Security Officer Thomas Bova (her alleged harasser) for about one (1) week.  (Hall Dep. at 47:2-5.)  Upon completion of her training, Plaintiff was assigned to the 4:00 p.m. to midnight shift, which became her regular shift. (Hall Dep. at 38:23-39:9.)

Plaintiff worked the 4:00 p.m. to midnight shift with Bova for "about a week total."  (Hall Dep. at 45:7-10; 47:6-11.)  Plaintiff recalls two or three times when there was some overlap between shifts where she and Bova were in the Gatehouse together.  (Hall Dep. at 47:19-48:3.) Altogether, however, Plaintiff and Bova only worked together on the same shift for two (2) weeks, and their shifts only overlapped two (2) or three (3) times putting them in contact with each other for only a few minutes.  (Hall Dep. at 46:1-48:13; 91:8-92:20; Bova Dep. at 98:12-20.[2])

Plaintiff received training on Guardsmark's sexual harassment policy when she began working at the BASF facility.  Plaintiff was instructed that an employee who felt she had been sexually harassed was to report the harassment through the "chain of command."  Further, the policy required any Guardsmark employee who believed she was the subject of sexual harassment to call and give an oral report immediately (preferably within 48 hours after the alleged harassment occurs) to her Manager in Charge and to the Sexual Harassment Policy Compliance Officers.  (Hall Dep. at 26:2-23; 30:17-31:14; see also Sexual Harassment Policy at 36.[3])

In August 2008, Plaintiff's chain of command began with Walter McCombs, her direct

---

[2] ECF No. 29 Ex. 2.
[3] ECF No. 29 Ex. 3.

supervisor.  McCombs, in turn, reported to Manager in Charge Katie Bohnke.  (Hall Dep. at 27:2-22; McCombs Dep. at 59:12-14.[4])  In April 2009, George Turner replaced Bohnke as the Manager in Charge. (Hall Dep. at 28:5-29:2; Turner Dep. at 9:3-5.[5])

Bova was another security officer of Plaintiff s at Guardsmark's BASF facility. McCombs also supervised Bova.  (McCombs Dep. at 82:1-3.)  Plaintiff alleges that Bova harassed her, as detailed below.

<u>The Chair Incident</u>

In October or November 2008,[6] while working on post together, Bova and Plaintiff had an altercation. (Hall Dep. at 76:1-79:18; see ECF No. 29 Ex. 4.)  According to Plaintiff, Bova was "yelling and screaming" at her, threw a chair at her and slammed a telephone (breaking it) during the incident in question.  (Hall Dep. at 76:3-4, 22-23; 82:7-9; 9-12.)[7]  Bova denied that he threw a chair, stating that he just got up quickly to leave when Plaintiff was yelling at him and the chair went in her direction.  (Bova Dep. at 80:1-6.)  The chair did not hit her.  (Hall Dep. at 82:23-83:3.)

Both Plaintiff and Bova contacted their supervisor, McCombs, immediately to report the argument. (McCombs Dep. at 43:1-2, 10-13; 44:6-9, 17-45:11; Hall Dep. at 78:6-15.)  McCombs told Plaintiff that he would have to do further investigations and report it to the main office. (McCombs Dep. at 46:19-20.)

The following day, Bohnke, the Manager in Charge, convened a meeting with McCombs,

---

[4] ECF No. 29 Ex. 5.
[5] ECF No. 29 Ex. 6.
[6] According to notes prepared by McCombs, this incident occurred on November 1, 2008.  (ECF No. 31 Ex. B.)
[7] In its reply brief, Defendant takes issue with the word "throw" and points to a place in Plaintiff's deposition where she used the word "slung."  (ECF No. 35 at 5.)  It has not explained the difference between these two terms.  Moreover, at another point in the deposition, Plaintiff in fact used the word "throw" (Hall Dep. at 76:3), as did her supervisor (McCombs Dep. at 43:12.)

Plaintiff and Bova.  Bohnke stated that she would not tolerate their conduct and instructed McCombs that Plaintiff and Bova were not to be scheduled on the same shift.  (Hall Dep. at 84:11-86:14; McCombs Dep. at 59:4-11.)  Plaintiff notes that McCombs told Bohnke that "I could do that, but it would still be … they have to at least see each other at least ten minutes out of the shift during the shift change."  (McCombs Dep. at 59:23-60:3.)  McCombs stated that he did not consider this change to constitute "action" to address Plaintiff's concerns.  (McCombs Dep. at 70:6-8, 14-18.)  He said "to me, an action would be a suspension or termination." (McCombs Dep. at 70:23-71:1.)  McCombs stated that, other than being put on different shifts, "nothing further ever done that I knew of."  (McCombs Dep. at 59:7-8.)

From that point until the end of Plaintiff's employment at Guardsmark, Bova was assigned to the midnight (overnight) shift while Plaintiff was assigned to the 4:00 p.m. to midnight shift.  (Hall Dep. at 45:12-14; 47:12-48:7; McCombs Dep. at 59:4-60:3.)

Plaintiff indicates that she "regularly complained of sexual harassment by Bova several times a week during the shift change."  (ECF No. 32 ¶ 58.)  Defendant notes that Plaintiff does not cite her own deposition in support of this statement.  Rather, McCombs states that: a) Plaintiff continued to complain that Bova was making sexual comments during shift changes/pass-ons (McCombs Dep. at 87:11-13); b) some weeks Plaintiff might "only" complain of harassment to McCombs "one or two times" whereas sometimes "it might have been every night" (McCombs Dep. at 87:20-23, 88:1-2); c) McCombs communicated the ongoing harassment to management "pretty much every time I heard about it" (McCombs Dep. at 87:14-19); d) McCombs passed Plaintiff's complaints on to Katie Bohnke (McCombs Dep. at 87:11-13); e) McCombs called Bohnke when he made the foregoing complaints (McCombs Dep. at 88:1-6); f) Bohnke took no action on the complaints other than to say "[j]ust … have them

4

working different shifts and to try to keep them from talking to each other" (McCombs Dep. at 88:11-14); g) the harassment of Plaintiff by Bova continued up until the time Plaintiff and Bova were terminated (McCombs Dep. at 88:15-19); h) Bova also told McCombs he was sexually attracted to Plaintiff (McCombs Dep. at 81:16-18); i) McCombs also submitted a written report to Account Manager William Harache and Bohnke advising that Bova kept saying to him "that he would like to go out with [Plaintiff]," and reported that he had reminded Bova "quite a few" times to stop those comments (McCombs Dep. at 62:1-7, 63:1-4, 65:13-20); and j) McCombs has no information on any action taken by Harache or Bohnke on his report (McCombs Dep. at 66:4-8).  However, Defendant has not explained why Plaintiff cannot refer to McCombs' deposition testimony to support her claims.

The Truck Comment

In April 2009, Plaintiff called McCombs and reported that Bova made the following comment to her: "don't get mad . . . I'd like to take you out to the parking lot and bend you over in the back of a truck and put it to you." (Hall Dep. at 118:1-3; 118:12-119:4; 122:3-7.)  Plaintiff immediately reported the incident to McCombs on her way home, noting that "that's how upset I was about it."  (Hall Dep. at 122:7.)

George Turner learned about Plaintiff's complaint in April 2009, shortly after being assigned the Pittsburgh branch of Guardsmark.  (Turner Dep. at 16:3-11.)  Plaintiff indicates that she told him "I couldn't take it no more.  I even told him … I am going to quit.  I can't take it no more."  Turner advised her not to quit and said "I'll be out to take care of it."  (Hall Dep. at 125:6-12.)

Parking Lot Incident

Plaintiff alleges that Bova attempted to run her over in the parking lot.  McCombs

confronted Bova about the incident and Bova described it as an "accident."  (McCombs Dep. at

60:11, 61:4-5.)  No action was taken as a result of this incident when McCombs passed it on to

Bohnke and Harache.  (McCombs Dep. at 61:14-20.)

Defendant responds that McCombs asked Bova about the incident and Bova stated that it

was an accident, that McCombs himself "felt it could have been an accident" and that

Guardsmark management reached the same conclusion.  (McCombs Dep. at 61:1-18.)  It further

notes that Plaintiff never cited this incident, even though she was asked to describe all incidents

of harassment by Bova.  However, as noted above, McCombs can testify about it.

<u>Bova's Alleged Comments to Other Security Officers</u>

Plaintiff's co-workers informed her that:

- Bova encouraged a co-worker to "bodily harm himself and say that" [Plaintiff] did it. (Hall Dep. at 102:11-13);
- Bova told Plaintiff's supervisors that she was "playing movies" on her shift (Hall Dep. at 102:19-21);
- Bova told a female co-worker that Plaintiff called her "fat." (Hall Dep. at 103:3-13.)

Plaintiff did not report these alleged rumors to any Guardsmark supervisor.  (Hall Dep.

at 105:8-20.)  She stated that "at the time they didn't want to hear nothing [sic].  Katie [Bohnke]

didn't want to hear nothing.  Bill [Harache] wouldn't say nothing.  I tried to tell Bill Harache

once about something with Mr. Bova and you know what he told me?  'If it don't concern you,

don't concern yourself with it.'  He never gave me a chance."  (Hall Dep. at 105:12-17.)

Plaintiff further testified that she attempted to tell Harache something about it "even after George

started working.  Bill didn't want to hear it."  (Hall Dep. at 124:19-23.)

<u>Comments That Plaintiff Alleges Bova Made to Third Parties</u>

Plaintiff's co-worker informed her that Bova stated that certain girls "wanted to stick

their fingers up his butt and check his prostate."  This alleged comment was not made directly to

Plaintiff by Bova (or even in her presence) and she failed to report it to Guardsmark management. (Hall Dep. at 108:19-109:5; 110:20-111:7.)  Plaintiff states that "it was beyond reporting.  They didn't want to hear nothing I had to say or anybody else.  Anything that came from me to the supervisor, they did not want to hear."  (Hall Dep. at 111:1-4.)

Plaintiff's co-worker informed her that Bova told certain girls who entered the BASF facility that they would, "look nice in a bikini."  (Hall Dep. at 111:8-20; 168:12-15.)  Plaintiff admits that Bova did not direct these alleged comments to her or even make the alleged comments in her presence. (Hall Dep. at 168:12-169:5.)

Comments that Plaintiff Alleges Bova Made to Her

In October 2008, Bova asked Plaintiff, "are you married," "why aren't you married," and he commented that "you're pretty."  Plaintiff failed to report these statements to Guardsmark management. (Hall Dep. at 57:1-4; 58:2-18; 59:14-60:4.)  According to Plaintiff, Bova informed her that she was a "troublemaker" who was trying to get him in trouble. (Hall Dep. at 103:20:-104:1.)  Bova would "go around telling everybody including myself, oh, Guardsmark can't do nothing to me.  I got a contract with Guardsmark.  I'll get my lawyer."  (Hall Dep. at 104:18-20.)

On two occasions, Bova told BASF employees how much "he loved them" and how they "made his day."  Plaintiff does not characterize these comments as "harassing" to her personally. (Hall Dep. at 115:7-10, 23-116:14.)

Plaintiff's Remaining Incidents of Purported Harassment

On three (3) occasions when Plaintiff was working with Bova, he left the Gatehouse without his radio, in violation of Guardsmark policy.  In one of these incidents, Bova left without his radio and then returned and yelled at Plaintiff for not having everything under control, making her cry.  Plaintiff reported these incidents to Guardsmark management. (Hall Dep. at

60:7-61:5; 63:10-15.)  On one (1) occasion, Plaintiff observed Bova sitting in his car – parked

several rows away from the Gatehouse – waiting to begin his midnight (12 a.m.) shift.  For

approximately fifteen (15) minutes, Plaintiff believed Bova was watching everything that she did

in the Gatehouse.  (Hall Dep. at 65:6-12; 66:12-13; 69:4-5; 71:1-4.)  Plaintiff, however, could not

see what Bova was doing or even whether his eyes were open. (Hall Dep. at 68:4-15.)  She tried

to report this incident to McCombs.  (Hall Dep. at 68:16-23.)  McCombs responded by saying

"don't tell me because there is nothing I can do…."  (Hall Dep. at 69:12-15.)

<u>Plaintiff Believed that Bova Was a Poor Employee</u>

Plaintiff believed that Bova did not follow Guardsmark's rules, was "goofing off" and

failed to perform his job duties.  (Hall Dep. at 149:10-150:1; 153:19-22.)  Plaintiff further

believed that Bova violated Guardsmark policy by: not attending mandatory meetings, failing to

hand in excuses for early absences, playing music, letting trucks sit for two hours on BASF time,

watching movies and trying to blame others for his conduct.  (Hall Dep. at 149:10-:22.)

Plaintiff maintained personal records in her locker while working at Guardsmark, which

were contemporaneous with the events detailed therein. (Hall Dep. at 155:17-156:6.)  These

records included the aforementioned incidents when Plaintiff believed Bova violated

Guardsmark's policies.  Plaintiff testified that the records "don't have nothing to do a whole lot

about me.  This is the stuff that he was doing that he [Bova] got by with.  All of this stuff that he

did that he got by with and nothing was ever done to him."  (Hall Dep. at 174:11-175:7; 176:21-

177:3.) Despite documenting Bova's violations of the rules, Plaintiff failed to maintain any

personal records of Bova's alleged sexual harassment.  (Hall Dep. at 156:14-157:14.)[8]

---

[8] Plaintiff admits all of these statements but contends that they are irrelevant to the allegations in
this case.  She does not rely on them in her briefs.

<u>Turner's Investigation</u>

When Turner began as the Manager in Charge at Guardsmark in April 2009, Plaintiff did not inform him of her problems with Bova. (Hall Dep. at 178:3-14.) She testified that "I had tried explaining that six months prior. Nobody listened. The damage was already done." (Hall Dep. at 178:14-16.) She further testified that, while Turner was not at the facility six months prior to his arrival, "Bill Harache was. So Bill didn't want to hear nothing. I tried to tell Bill about Bova [and he said] 'if it don't concern you, don't concern yourself.'" (Hall Dep. at 178:19-23.)

Turner learned of Plaintiff's allegations regarding the April 2009 Truck Comment from William Harache, Guardsmark's Account Manager for the BASF account. (Turner Dep. at 16:3-11.) Upon learning of Plaintiff's allegations, Turner and Harache gathered information and statements from Plaintiff, Bova and other security officers at the BASF facility. (Turner Dep. at 16:3-17:4; 18:15-20; 19:8-13.)

Turner and Harache met with Bova to discuss Plaintiff's allegations of sexual harassment. Bova denied the accusations. (Turner Dep. at 30:7-11, 16-18.) Turner also spoke to Bova on the phone regarding the October 2008 Chair Incident. Bova admitted that he slammed down the phone. (Turner Dep. at 30:19-23.)

Turner and Harache spoke with two (2) other security officers, Donna Jacobs and Richard Doutt, about Plaintiff's allegations of sexual harassment. Neither Jacobs nor Doutt heard anything similar to what Plaintiff had alleged. (Turner Dep. at 32:3-18.) Turner and Harache also attempted to interview two (2) other security officers, who "felt the two of them [Plaintiff and Bova] were negative and there was a constant amount of negativity coming from" them. (Turner Dep. at 34:2-21.)

9

During the course of Turner's investigation (in early July 2009), Plaintiff spoke with him on the telephone about her complaints regarding Bova.  (Hall Dep. at 73:11-15; 74:2-8.)  Plaintiff told Turner that something had to be done, that she could not take it anymore and that she was going to quit. (Hall Dep. at 74:11-14; 125:8-9.)  Plaintiff admits that Turner encouraged her not to quit and said that he would "be out to take care of it."  (Hall Dep. at 125:10-12.)  Plaintiff notes that an entire week passed after Turner made this comment, yet Turner did not come out as he had promised.  (Hall Dep. at 74:11-15.)

Turner scheduled a formal meeting with Plaintiff on July 7, 2009, to discuss Bova's alleged harassment and to continue his investigation into her allegations of sexual harassment. (Turner Dep. at 21:4-10; 27:22-25; 48:23-49:6.)

Plaintiff's Resignation Email

On July 7, 2009 (the date of her scheduled meeting with Turner), Plaintiff sent an email to Turner announcing her resignation and providing two weeks' notice.  (Hall Dep. at 161:11-17; see ECF No. 29 Ex. 7.)  Upon receiving Plaintiff's resignation, Turner called Plaintiff and encouraged her not to resign, but rather to meet with him as scheduled.  Plaintiff, however, indicated that she was not going to meet with him and that she was, in fact, resigning.  (Turner Dep. at 45:14-21; 46:6-11; 47:8-22; 48:23-25; 57:2-9; Hall Dep. at 125:1-12.)  Plaintiff notes that two weeks had passed as of that time and Turner had still not come out to talk to her as he had promised.  (Hall Dep. at 74:7-8.)

Plaintiff's July 8, 2009 Letter to Donna Smith

Several days before tendering her resignation to Guardsmark, Plaintiff spoke with Donna Smith in Guardsmark's Inspection Regulatory and Compliance Division.  Smith instructed Plaintiff to send her a written document detailing her complaints of sexual harassment. (Hall

Dep. at 160:3-6.)  On July 8, 2009, the day after she tendered her resignation, Plaintiff sent Smith her written complaint.  (Hall Dep. at 159:10-17; Turner Dep. at 51:14-16; see ECF No. 29 Ex. 8.)

Smith sent Plaintiff's complaint to Turner by facsimile on July 16, 2009 and instructed him that "comments should be promptly reported to management for appropriate corrective action."  (Turner Dep. at 51:3-21; 53:14-25; see ECF No. 29 Ex. 8.)  When Turner received the document he informed Smith that they had no corroboration for Plaintiff's allegations and that Plaintiff had already tendered her resignation with two weeks' notice.  (Turner Dep. at 51:17-52:3; 54:8-13.)

<u>The Events of July 16, 2009</u>

Defendant states that, between July 7, 2009 (when Plaintiff announced her resignation) and July 16, 2009 (Plaintiff's separation date from Guardsmark), Plaintiff never rescinded — either verbally or in writing — her resignation. (Hall Dep. at 184:5-19; see ECF No. 29 Ex. 9.) Turner states that he called Plaintiff on July 16, 2009 and informed her that Guardsmark was honoring her resignation. (Turner Dep. at 44:21-45:12.)

A note made contemporaneously with this call states as follows:

● [Manager in Charge] Turner & [Relationship Manager Harache] telephoned Hall
● Turner asked Hall if she had a few moments to speak privately
● Turner advised Hall that we would honor her two weeks resignation she submitted
● Hall stated she didn't put in her two-week notice.  Hall stated that she was just stating that she might put in her notice.
● Hall stated to cry stating "What am I to do about a job now?"
● Hall states she sent the email stating she was resigning just to get someone's attention.
● Turner asked Hall where she would like her last check mailed to[]?  Hall stated "Whatever" and hung up.
● Hall called back and stated she wants her check direct deposit and to mail the stub to her residence.
● Turner advised Hall not to go to the site and that all personal property will be removed from the site and returned to her by [Harache] and Turner.

11

((ECF No. 29 Ex. 10.)  Plaintiff stated that she was "devastated because I had no intention for this turn out this way.  I didn't want to lose my job.  I didn't have another job."  (Hall Dep. at 183: 20-22.)  Plaintiff states that she failed to rescind her resignation because "he never talked to me … he never acknowledged that until my two weeks notice when he called on the 17th."  (Hall Dep. at 184:10-13.)  She thought that when she sent the email to Turner, he would see that something was really wrong and would come to see her immediately, but he never did.  (Hall Dep. at 184:17-19.)

Procedural History

Plaintiff filed a charge of discrimination with the Pennsylvania Human Relations Commission (PHRC) on November 19, 2009 and it was cross-filed with the Equal Employment Opportunity Commission (EEOC).  The EEOC issued a notice of right to sue on October 29, 2012 and more than one year elapsed since Plaintiff filed with the PHRC.  (Compl. ¶ 11.)

Plaintiff filed this action on January 28, 2011.  Count I alleges sexual harassment in violation of Title VII.  Count II alleges a claim of retaliation in violation of Title VII.  Count III alleges claims of sexual harassment and retaliation under the PHRA.  On February 17, 2012, Defendant filed a motion for summary judgment.

Standard of Review

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty- Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendant argues that: 1) Plaintiff has not proffered evidence from which a trier of fact could conclude that she was subjected to discrimination that was "severe" or "pervasive"; 2) some of the incidents were not motivated by Plaintiff's gender; 3) even if she demonstrated that she was subjected to severe or pervasive harassment based on her gender, it has demonstrated that it promptly investigated her complaints and took remedial action to prevent any further harassment; and 4) her retaliation claim fails as a matter of law because she resigned and she cannot meet the standard for demonstrating that she was constructively discharged.

Plaintiff responds that: 1) she was subjected to nearly constant comments and actions by Bova, so she can demonstrate that the conduct was pervasive and some of the incidents (the Chair Incident, the Truck Comment and the incident in which Bova attempted to run her over with his car) meet the definition of "severe"; and 2) placing Plaintiff and Bova on different shifts obviously was ineffective because they still had to see each other for at least ten minutes each

13

day during shift changes and McCombs was independently aware that Bova was continuing to harass her, yet no further action by management was taken.  Plaintiff has not responded to Defendant's arguments concerning whether or not some of the incidents were motivated by her gender and whether she can state a separate claim for retaliation.

Hostile Work Environment Claims

Title VII and the PHRA provide that it is an unlawful employment practice for an employer to discriminate against an individual with respect to conditions of employment because of her gender.  42 U.S.C. § 2000e-2(a); 43 P.S. § 955(a).  The Supreme Court has held that a plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working environment.  Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998).  The Court of Appeals has held that a plaintiff must demonstrate that:

> (1) she suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted).  The same standard applies under the PHRA.  Weston v. Commonwealth of Pa., 251 F.3d 420, 425 & n.3 (3d Cir. 2001).

In Faragher and Burlington Industries v. Ellerth, 524 U.S. 742 (1998), the Supreme Court held that an employer will be held vicariously liable when a supervisor's harassment culminates in a "tangible employment action" such as firing, demotion or undesirable reassignment, but that otherwise the employer can present a defense that it had a readily accessible and effective sexual harassment policy and that the plaintiff unreasonably failed to avail herself of it.  The burden to establish this defense by a preponderance of the evidence falls on the employer.  Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807.  In Pennsylvania State Police v. Suders, 542 U.S. 129

(2004), the Court held that this two-part defense is available in a constructive discharge case if

the employer makes no official act causing the employee to suffer a tangible employment action

(such as a demotion, reduction in compensation or transfer to a position in which the employee

would face unbearable working conditions).

However, when the alleged harasser is not a supervisor but a coworker, "the plaintiff

must prove employer liability using traditional agency principles." Andreoli v. Gates, 482 F.3d

641, 648 (3d Cir. 2007) (citation omitted).  Specifically, the Court of Appeals has stated that:

> An employer will be liable for the harassing conduct of the alleged
> victim's coworker if the employer was "negligent or reckless in failing to train,
> discipline, fire or take remedial action upon notice of harassment." Bonenberger
> v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997) (citing Bouton v. BMW of N.
> Am., Inc., 29 F.3d 103, 106 (3d Cir. 1994)).  An employer is negligent if it "knew
> or should have known about the harassment, but failed to take prompt and
> adequate remedial action." Jensen v. Potter, 435 F.3d 444, 453 (3d Cir. 2006)
> (internal quotations omitted).  Even if the remedial action does not stop the
> alleged harassment, it is "adequate" if it is "reasonably calculated" to end the
> harassment. Id. (quoting Knabe v. Boury Corp., 114 F.3d 407, 412-13 (3d Cir.
> 1997)).

Id. at 644 (footnote omitted).  This is not an affirmative defense, but rather the burden of the

plaintiff.  However, unlike in a situation involving harassment by a supervisor, in a co-worker

harassment situation the issue of whether the employee failed to avail herself of "preventive

opportunities" is not present. Id. at 648.  In Andreoli, the court concluded that, when an

employee had to complain to four supervisors just to get her harasser transferred and then he

continued his acts with no further intervention, the issue of whether the employer's response was

prompt and adequate had to be determined by the jury.

Whether the Conduct was "Because of" Plaintiff's Gender

Defendant argues that some of the incidents – Bova throwing a chair at her and breaking

a telephone, watching her from his car during his shift, leaving his post without his radio in

violation of Guardsmark policy – do not appear to be based on her gender, but relate to her poor working relationship with him.  It does not contend that the Truck Comment or the other comments he allegedly made to her were not based on her gender.

The Court of Appeals has held that "courts should not consider each incident of harassment in isolation.  Rather, a court must evaluate the sum total of abuse over time." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 155 (3d Cir. 1999) (citation omitted).  In that case, the evidence demonstrated that Dianne Evans, who had been an extremely successful life insurance salesperson for Met Life for seventeen years, had been recruited to join Durham, where she was promised her own office and secretary, as well as unlimited phone and mailing costs to be paid for by Durham.  However, when new managers took over, they fired Evans' secretary, took over her office and (at least on one occasion) grabbed her buttocks from behind and told her that she smelled good.  She was assigned numerous "lapsed books," policies that were no longer active because the policyholders had switched insurance companies, and because of the way commissions were calculated, her bonus was severely cut; no male agents received as many lapsed books.  In addition, Evans was subjected to derogatory comments, including the following: she "made too much money for a goddamn woman"; she was asked to go dancing "into the fields" with the acting general manager; she was threatened that if she tried to leave and take clients with her the company would "attach her house before she left the courtroom"; when she lost an account because promised legal assistance from the home office did not arrive, her supervisor said "What do you know about annuities, you're only a woman."  Finally, she was told that she was being moved to another office and then (after she had assembled all of her files for the move) she was told that she was not moving and she discovered that her files were gone. Id. at 145-46.

Durham argued that the court should not have considered all of these incidents together, because some of them were apparently triggered by sexual desire, some were sexually hostile some were non-sexual but gender-based, and some were facially neutral.  However, the Court of Appeals held that it would "treat the sexual misconduct and the gender-based mistreatment in this case as sex discrimination.  The facially neutral mistreatment plus the overt sex discrimination, both sexual and non-sexual, in sum constituted the hostile work environment." Id. at 148 (citations omitted).  See also Abramson v. William Paterson College of N.J., 260 F.3d 265, 276 (3d Cir. 2001) ("While the individual pieces of evidence alone may not suffice to make out the claims asserted, we must view the record as a whole picture.")

In this case, although some of the incidents may not have an overt sexual content, they may be considered along with all of the other evidence that does suggest harassment based on gender.  This argument is rejected.

Whether the Conduct Was "Severe" or "Pervasive"

The Supreme Court has stated that: "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

In this case, Plaintiff points to the Chair Incident, the Truck Comment and the allegation that Bova attempted to run her over with his car to establish that she suffered "severe" harassment. She also contends that she was subjected to "pervasive" harassment, citing testimony by McCombs that: 1) she continued to complain to him about Bova harassing her during shift changes; 2) this harassment continued until she and Bova were terminated; and 3)

17

separately, Bova told McCombs that he was sexually attracted to Plaintiff.

Defendant argues that these allegations are unsupported by the deposition testimony of record and that they do not meet the standard for severe or pervasive harassment.  The Court need not determine whether Plaintiff can establish that she suffered severe harassment, because the record is sufficient to allow the trier of fact to conclude that she may have suffered pervasive harassment.

Defendant contends that McCombs' testimony contradicts Plaintiff's testimony, which does not support the argument that she continued to be subjected to frequent harassment by Bova after they were put on separate shifts in November 2008 because she did not engage in very many pass-ons with Bova because she "tried to avoid him" and "made other guards do it."  (Hall Dep. at 71:7-9; 92:16-20.)  However, as noted above, on a motion for summary judgment, a court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770 (3d Cir. 2009) (citation omitted).  McCombs can testify as to incidents of harassment that Plaintiff reported to him, the fact that he reported them up the chain of command and that no further action was taken.  McCombs can also testify that Bova told him he was sexually attracted to Plaintiff and wanted to go out with her and McCombs told him to stop making these comments. Defendant can cross-examine Plaintiff to inquire about her apparent failure to identify these incidents in her deposition and her statements that appear to imply that she was not harassed by Bova during shift changes because she tried to avoid him, but these contradictions (if they are contradictions) do not allow Defendant to argue that these incidents never occurred in the context of a motion for summary judgment.

The Court concludes that the record allows for the inferences that, although Guardsmark

18

took some action when Plaintiff complained, she continued to suffer harassment by Bova, that she continued to complain to McCombs, who reported the incidents to Bohnke, that no further remedial action occurred and that the situation continued to get progressively worse.  She has stated a claim for a hostile work environment.

Basis for Employer Liability

Defendant argues that the record is undisputed that Guardsmark did respond to Plaintiff's complaints, even if the harassment did not cease.  However, as noted above, the record allows for the inferences that Plaintiff continued to be harassed by Bova during shift changes, that she complained about these incidents and that nothing was done to remedy them.  In addition, Defendant concedes that she reported that she was later subjected to the Truck Comment.[9] Finally, Turner indicates that he was investigating the Truck Comment and preparing to address it further and that Plaintiff did not allow him to do so, but instead resigned.  Yet the record is in dispute as to whether Turner's investigation in July 2009 was "prompt" with respect to the Truck Comment that was made and he learned about in April 2009.  In addition, the record allows for the inferences that Turner kept promising Plaintiff he would deal with the situation and did not do so and that he "accepted" her "resignation" (which she sent in to get someone's attention) despite her statements to him that she did not really wish to resign.  In other words, the trier of fact could conclude that Turner utilized Plaintiff's (arguably unwise) announcement that she was "resigning" as an excuse to be relieved of the responsibility to further investigate and deal with the matter.

Thus, Plaintiff's hostile work environment claim is sufficient, because she has submitted

---

[9] It is noted that the Truck Comment occurred during a shift Plaintiff and Bova worked together in April 2009, despite Defendant's insistence that managers made sure they never worked the same shift after the Chair Incident.

evidence from which the trier of fact could conclude that she was subjected to pervasive

harassment and also because the record is in dispute as to whether Guardsmark took adequate

remedial action by merely putting her and Bova on separate shifts and ignoring her complaints

that he continued to harass her during shift changes thereafter.  The record is also in dispute as to

whether Turner's announcement in July 2009 that he was about to deal with the Truck Comment

(three months after it occurred) was "prompt" and whether his "acceptance" of the "resignation"

Plaintiff did not intend to pursue and dropping of the investigation was "adequate."  With respect

to the hostile work environment claims, the motion for summary judgment will be denied.

<u>Constructive Discharge</u>

Plaintiff alleges that the harassment by Bova led to her constructive discharge.

Defendant argues that this claim fails because she does not point to circumstances that would

support an instance of constructive discharge.

The Supreme Court has recognized that:

> Under the constructive discharge doctrine, an employee's reasonable
> decision to resign because of unendurable working conditions is assimilated to a
> formal discharge for remedial purposes.  The inquiry is objective: Did working
> conditions become so intolerable that a reasonable person in the employee's
> position would have felt compelled to resign?

<u>Suders</u>, 542 U.S. at 141 (citations omitted).  The Court further observed that, as compared to a

pure hostile work environment claim, "[a] hostile-environment constructive discharge claim

entails something more: A plaintiff who advances such a compound claim must show working

conditions so intolerable that a reasonable person would have felt compelled to resign."  <u>Id.</u> at

147 (citations omitted).

The Court of Appeals has explained that:

> "We employ an objective test to determine whether an employee can recover on a
> claim of constructive discharge .... [and must therefore] determine whether a

reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001) (internal quotations and citation omitted). Factors we have found relevant to this issue are whether the employer (1) "threatened [the employee] with discharge" or "urge[d] or suggest[ed] that she resign or retire," (2) "demote[d] her," (3) "reduce[d] her pay or benefits," (4) "involuntarily transferred [her] to a less desirable position," (5) altered her "job responsibilities," or (6) gave "unsatisfactory job evaluations."

Colwell v. Rite Aid Corp., 602 F.3d 495, 502-03 (3d Cir. 2010) (quoting Clowes v. Allegheny

Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)).

Defendant argues that none of the cited factors apply. However, although Plaintiff's counsel has not developed the argument, the record allows for the inference that Guardsmark "encouraged her to resign" by "accepting" her "resignation" even when she indicated that she had not really meant to resign and that it tolerated continued harassment of her by Bova without attempting to address the matter, until the situation reached a point where a reasonable person in Plaintiff's position may have felt compelled to resign. Therefore, the constructive discharge claim will not be dismissed.

Retaliation

Plaintiff alleges that Defendant retaliated against her for complaining about Bova's harassment by terminating her, that is, by constructively discharging her from her employment. Defendant argues that this claim fails as a matter of law because she was not terminated but instead resigned. Plaintiff has not responded to this argument.

Discrimination against an individual who has opposed a practice prohibited by Title VII or the PHRA or who has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under Title VII is itself actionable conduct. A plaintiff may submit a claim for retaliation. 42 U.S.C. § 2000e-3(a); 43 P.S. § 955(d).

The Court of Appeals has stated that:

> To establish a prima facie case of retaliation, a plaintiff must show that:
> (1) he or she engaged in a protected employee activity; (2) the employer took an
> adverse employment action after or contemporaneously with the protected
> activity; and (3) a causal link exists between the protected activity and the adverse
> employment action.

Weston, 251 F.3d at 430 (citations omitted).  However, when the adverse employment action

consists of a claim of constructive discharge, this framework probably does not apply.

As noted above, in Suders, the Supreme Court refused to treat a constructive discharge as

a tangible employment action, unless the supervisor took official action to trigger it, which did

not occur in this case.  This strongly suggests that the Court would not accept the argument that

an employee who complains about a hostile work environment and thereafter suffers continued

incidents of harassment – allegedly leading to a constructive discharge – can maintain a separate

claim for retaliation.  Simply put, Plaintiff has pointed to no adverse employment action that she

suffered as a result of her having complained about incidents of sexual harassment in the

workplace.  Rather, the hostile work environment about which she had complained continued

and led to her decision to leave, but this series of events does not permit her to maintain a

separate claim for retaliation.  Therefore, with respect to the retaliation claims, the motion for

summary judgment will be granted.

An appropriate order follows.

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Date: May 3, 2012